Anne JACKSON et al., Appellants,

v.

DISTRICT OF COLUMBIA et
al., Appellees.

No. 79–283.

District of Columbia Court of Appeals.

Argued Nov. 13, 1979.

Decided March 6, 1980.

Rehearing and Rehearing En Banc Denied
April 28, 1980.

A. Palmer Ifill, Washington, D. C., for appellants.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, and Richard W. Bar-

ton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellees.

Before KELLY, FERREN and PRYOR, Associate Judges.

FERREN, Associate Judge:

Michael Jackson and his parents appeal from an order granting summary judgment on all their claims derived from a mistaken arrest of Michael by District of Columbia police and federal agents. The Jacksons contend that (1) the trial court improperly considered a defense of collateral estoppel, since it was not affirmatively pleaded, (2) the trial court erred in holding their claims barred by collateral estoppel based on a prior judgment of the United States District Court, and (3) the trial court erred in finding that the police officers had probable cause and reasonable grounds to arrest Michael. We affirm on all counts.

## I.

This case results from an arrest at the close of the Sting II operation conducted by law enforcement officials in 1976. Sting II was an undercover project in which District of Columbia and federal law enforcement agents posed as "fences" operating out of a garage labeled H & H Trucking Service in Northeast Washington. Each purchase of goods was recorded on videotape and noted in a police report. On several occasions in early 1976, a young man named Michael Jackson sold stolen goods to Sting agents and was recorded on videotape. In order to locate juvenile suspects such as Jackson, Detective Green of the Metropolitan Police asked local school officials to identify students from photographs taken from the videotape. When shown a photograph of Michael Jackson, both the principal of Shaw Junior High School and a school aide identified the subject as Michael Jackson, a Shaw student who was then 16 years old. The principal provided the police with an ad-

dress from school records, 2011 First Street, N.W. Green verified this address through juvenile court records.

At approximately 6 a. m. on July 6, 1976, a team including Special Agent Young of the FBI; Agent Horton of the Bureau of Alcohol, Tobacco and Firearms; Officers Beasley, Howery, and Webber of the Metropolitan Police Department; and Ernest Hanley of the Federal Protective Service, arrived at Michael Jackson's home on First Street to make an arrest.[1] Two of the police officers and Agents Horton and Young went to the front door while the other members of the team covered the back. The officers rang the doorbell; Wesley Jackson, Michael's twelve-year-old sister, answered. The parties disagree about whether she gave the officers permission to enter, but agree that the officers did come into the house and arrest Michael Jackson in bed. Michael objected that he was not the person the officers were looking for, but they took him into custody nonetheless. The Jacksons also claim that the officers first entered Mrs. Jackson's bedroom while she was undressed and in bed, insisting that she tell them where Michael was, and that the officers pulled guns on Michael.

Michael was taken to the Police Academy, where the Sting arrestees were being processed. During the course of processing, Michael was pointed out to Detective Green, who realized that the wrong Michael Jackson had been arrested. Green explained the mistake to Michael and offered to drive him home. Green did so and explained the error to Mrs. Jackson. As a result of the arrest, Michael Jackson had been away from home for approximately four hours.

The Jacksons filed two suits for damages based on the mistaken arrest. The first was filed on February 18, 1977, in Superior Court, claiming damages for slander and defamation,[2] violation of the constitutional

---

1. A warrant was not obtained for the arrest. D.C.Code 1973, § 16–2309 permits a child to be taken into custody "by a law enforcement officer when he has reasonable grounds to believe that the child has committed a delinquent act."

2. Plaintiffs later dropped this claim.

right of privacy, invasion of privacy, procuring arrest and imprisonment, false arrest and imprisonment, false pretenses, negligence, breaking and entering, infliction of emotional distress, and assault and battery. The defendants were the District of Columbia, then-Mayor Walter Washington, then-Chief of Police Maurice J. Cullinane, Sting II, H & H Trucking Service, Detective Green,[3] and the employees of Sting II. The Jacksons filed a second suit in the United States District Court for the District of Columbia against the federal agents, Young and Hanley, alleging a violation of the constitutional right of privacy. The federal district court granted summary judgment for the defendants in *Jackson v. Young,* No. 77–1010 (D.D.C. May 4, 1978). That judgment was affirmed by per curiam order of the United States Court of Appeals for the District of Columbia Circuit in *Jackson v. Young,* 194 U.S.App.D.C. 400, 600 F.2d 280 (D.C. Cir. 1979).

In their motion for summary judgment in the Superior Court suit, defendants argued that, because of collateral estoppel, the district court decision precluded further litigation of many of the issues in the Superior Court action; that they were entitled to judgment on all claims as a matter of law because the arrest was reasonable and based on probable cause; and that defendants Washington and Cullinane could not be held liable in their official capacities because superior officers are not responsible for the torts of fellow employees. The trial court agreed with all three arguments and granted summary judgment for the defendants on all counts. The Jacksons have appealed.

## II.

The Jacksons contend, first, that the trial court should not have considered the defendants' collateral estoppel argument because Super.Ct.Civ.R. 8(c) requires a party to "set forth affirmatively . . . estoppel, . . . res judicata, . . . and any other matter constituting an avoidance or affirmative defense" in the pleadings. On March 23, 1977, when the defendants filed their answer, a collateral estoppel defense was not available because the district court decision (of May 4) had not yet been announced, but the defendants never amended their answer to include the collateral estoppel defense.

■ Although orderly progress of litigation requires that parties have notice of the claims and defenses asserted, there is room for flexibility in interpreting Rule 8(c), and where no prejudice results from a party's failure to adhere to the letter of the rule, a defense should not be lost. *See Willis v. Fournier,* 418 F.Supp. 265, 267 (M.D.Ga.), *aff'd,* 537 F.2d 1142 (5th Cir. 1976); *Beall v. Kearney & Trecker Corp.,* 350 F.Supp. 978, 981 (D.Md.1972); *see also North Central Truck Lines v. United States,* 381 F.Supp. 1217, 1220 (W.D.Mo.1974), *aff'd,* 420 U.S. 901, 95 S.Ct. 820, 42 L.Ed.2d 832 (1975).[4] The plaintiffs here were not prejudiced by the defendants' failure to amend their answer to include the collateral estoppel defense. They were aware of the judgment of the district court, since they were parties to that action. In the summary judgment motion, the defendants argued the effect of the prior judgment, and the plaintiffs responded to this argument in their opposition to the motion.[5] The trial judge therefore considered the views of both parties on the collateral estoppel issue.

---

**3.** Plaintiffs later dropped Green as a defendant.

**4.** These cases interpret Fed.R.Civ.P. 8(c), which is identical to Super.Ct.Civ.R. 8(c). We accordingly look to authority interpreting the federal rule. *See Moore v. Moore,* D.C.App., 391 A.2d 762, 768 (1978).

**5.** Since the parties had presented their views on the merits of the collateral estoppel issue,

even though it is a Rule 8(c) defense, the trial court might have permitted an amendment to the pleadings pursuant to Super.Ct.Civ.R. 15(a), *see Lasseigne v. Nigerian Gulf Oil Co.,* 397 F.Supp. 465, 476 (D.Del.1975), or the court might have deemed the answer amended under Rule 15(b). *See Fey v. Walston & Co.,* 493 F.2d 1036, 1050 (7th Cir. 1974). *See generally Moore, supra* at 767–69.

His conclusion should not be set aside for a technical pleading error.[6]

## III.

We turn to the question whether the defendants can use the federal district court judgment to preclude the Jacksons from relitigating issues decided in that prior suit. Since the defendants were not parties to the federal litigation, they could not invoke the judgment under a strict rule of mutuality.

> The doctrine of mutuality requires that, as a general proposition, one who invokes the conclusive effect of a judgment must have been either a party or his privy to the suit in which the judgment was rendered. Stated differently, the mutuality requirement prevents a litigant from invoking the conclusive effect of a judgment unless he would have been bound if the judgment had gone the other way. [1B Moore's Federal Practice ¶ 0.412[1] at 1801 (1974) (footnote omitted).] [7]

We have recognized that issue preclusion may not be asserted *against* one who was not a party in the first case. *See W. W. Chambers, Inc. v. Audette,* D.C.App., 385 A.2d 10, 13–14 n. 4 (1978); *Schrier v. Home Indemnity Co.,* D.C.App., 273 A.2d 248, 251 (1971); *Wolf v. Paving Supply & Equip-*

ment Co., D.C.Mun.App., 154 A.2d 544, 546 (1959). But this case presents a different question: whether a defendant may assert preclusion against a plaintiff on issues that were litigated in a prior suit by the same plaintiff. In this situation, we conclude that the answer is yes.

In *Bernhard v. Bank of America National Trust & Savings Association,* 19 Cal.2d 807, 122 P.2d 892 (1942), the leading case recognizing the "defensive" use of res judicata,[8] Justice Traynor explored the reasoning behind precluding relitigation of issues in various situations. He found that one who had not been a party to earlier litigation could not be precluded by a prior judgment because "[t]he requirements of due process of law forbid the assertion of a plea of res judicata against a party unless he was bound by the earlier litigation in which the matter was decided." *Id.* at 812, 122 P.2d at 894 (citations omitted). A party must have a day in court on an issue before being barred from litigating it. But the *Bernhard* court found no satisfactory rationale for the mutuality doctrine when preclusion is asserted against a party who already has had a day in court on the issue. *Id.* at 812, 122 P.2d at 895. We agree with the many courts which have followed *Bernhard* and have permitted preclusion in such cases.[9]

---

**6.** We also reject the Jacksons' contention that the defendants' summary judgment motion was improper because two of the attached affidavits were signed but not sworn documents which had been submitted in the federal litigation. Super.Ct.Civ.R. 56(a) provides that a claimant need not file affidavits at all, and in any event there is no indication that the trial court relied on the signed statements.

**7.** Although there are exceptions to the mutuality doctrine, the case of joint tort-feasors does not fall within any of them: "Since one joint tort-feasor is not, on the basis of that relationship alone, bound by a judgment against another joint tort-feasor, the doctrine of mutuality precludes one joint tort-feasor from invoking the conclusive effect of a judgment exonerating another." 1B Moore, *supra,* ¶ 0.412[4] at 1825 (footnote omitted).

**8.** We rely on cases involving res judicata as well as those, like the present suit, involving collateral estoppel because the mutuality doctrine applies equally to both defenses.

**9.** *See Blonder–Tongue Laboratories, Inc. v. University of Ill. Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) (mutuality not required where collateral estoppel is asserted by a defendant in patent action); *Federal Sav. & Loan Ins. Corp. v. Hogan,* 476 F.2d 1182 (7th Cir. 1973) (same in suit alleging conspiracy to defraud brought by federal agency); *Lober v. Moore,* 135 U.S.App.D.C. 146, 417 F.2d 714 (1969) (applying Virginia law and "prevailing American legal doctrine"); *Crutsinger v. Hess,* 408 F.Supp. 548 (D.Kan.1976) (applying Kansas law). *See also Mecham v. City of Glendale,* 15 Ariz.App. 402, 489 P.2d 65 (1971); *Pat Perusse Realty Co. v. Lingo,* 249 Md. 33, 238 A.2d 100 (1968); *Home Owners Fed. Sav. & Loan Ass'n v. Northwestern Fire & Marine Ins. Co.,* 354 Mass. 448, 238 N.E.2d 55 (1968); *In re Estate of Ellis,* 468 Pa. 281, 333 A.2d 728 (1975).

The American Law Institute is also shifting its position on the mutuality doctrine. In the Restatement of Judgments issued in the same year as *Bernhard, supra,* mutuality was required before a party in a second suit could claim the benefit of a prior judgment. *See*

When issue preclusion is asserted defensively, there are no inherent considerations of fairness or correct resolution of the dispute that should prompt a court to rehear issues already decided. Preclusion here is urged against plaintiffs who were able to choose the claims and the forum for the litigation resolved first.[10] The public interest in judicial economy and in ending repetitious litigation dictates that "it would be unjust to permit one who has had his day in court to reopen identical issues by merely switching adversaries." *Bernhard, supra* at 813, 122 P.2d at 895; *accord, Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971) ("Permitting repeated litigation of the same issues as long as the supply of unrelated defendants holds out reflects . . . the aura of the gaming table . . . ." The defendants here may therefore assert the judgment of the United States District Court, to the extent of its reach.[11]

## IV.

The question then becomes: did the Jacksons have a full and fair opportunity in their federal suit to litigate to a final judgment the identical issues raised in this suit?

Restatement of Judgments § 93 (1942). But Restatement (Second) of Judgments § 88 at 161 (Tent. Draft No. 3, 1976), provides: "A party precluded from relitigating an issue with an opposing party . . . is also precluded from doing so with another person [unless the circumstances justify relitigation]."

10. In fact, the original complaint filed by the Jacksons in federal district court charged various defendants with false arrest, assault and battery, and improper entry into plaintiffs' home. Plaintiffs later amended that complaint so that it named agents Young and Hanley as the defendants and eliminated the false arrest, assault and battery claims, basing their lawsuit solely on the alleged violation of plaintiffs' Fourth Amendment right to privacy.

11. We need not reach the question whether a plaintiff could "offensively" assert the effect of a prior judgment to which he or she was not a party. *But see Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 1979) (authorizing offensive assertion of a prior judgment: "We have concluded that the preferable approach . . . in the

*See Blonder-Tongue, supra* at 333, 91 S.Ct. at 1445; *Brown v. DeLayo*, 498 F.2d 1173, 1175–76 (10th Cir. 1974). The Jacksons do not contend here that they had less than a full and fair opportunity to litigate their claim of invasion of the constitutional right of privacy in the district court.[12] The plaintiffs also have not argued that there is any difference between the applicable legal standards in the federal court and the Superior Court which might render the federal court's opinion inapplicable here. The district court judgment was final and terminated that claim. We therefore must evaluate what other issues, if any, determined by the district court, are identical to issues presented in this case. *See Henderson v. Snider Brothers, Inc.*, D.C.App., 409 A.2d 1083 at 1087 (1979).

For preclusion purposes, an "issue" is not limited to a "cause of action." *See Clemens v. Central Railroad Co.*, 399 F.2d 825 (3d Cir. 1968), *cert. denied*, 393 U.S. 1023, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969). Although the Jacksons' Superior Court complaint alleged damages under causes of action in tort not brought in the district court suit, we must look beyond the labels of the claims in the two courts and examine the "single, certain and material point[s] arising

federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied.") (footnote omitted); *Ross v. Lawson*, D.C.App., 395 A.2d 54 (1978) (plaintiff in civil action may assert judgment in a preceding criminal action against party who is a defendant in both cases).

12. The district court judge did note in his memorandum opinion, at 3 n. 5, that "[t]he Court is unaided by any affidavit from plaintiff Michael Jackson or by any statement of genuine issues setting forth the facts in dispute," materials which were submitted to the Superior Court in this action. Since the plaintiffs could have produced those items in the district court and apparently chose not to do so, we are not presented with a question whether the availability of new evidence should bar the preclusion of the issues litigated. *See Technograph Printed Circuits v. Packard Bell Elecs. Corp.*, 290 F.Supp. 308, 316 (C.D.Cal.1968) (previously available expert opinions do not constitute new evidence which might bar issue preclusion).

954

out of the allegations and contentions of the parties." *Paine & Williams Co. v. Baldwin Rubber Co.*, 113 F.2d 840, 843 (6th Cir. 1940).

The district court's findings of fact do not differ in any significant respect from the facts set forth in Part I *supra*. That court, in addition, expressed the following conclusion of law critical to its determination that the Jacksons had not established a claim for invasion of the constitutional right of privacy:

> It is undisputed that Young's entry into the Jackson house was not forcible and that no damage to the house occurred. Further, the Court is satisfied that agent Young's entry into the Jackson home was with probable cause and in a good faith effort to arrest a Sting II suspect. There is no claim that the misidentification of plaintiff Michael Jackson was intentional or that agent Young knew that he was arresting the wrong youth. The Court finds that the facts underlying the arrest sufficiently validate the arrest, that the misidentification of plaintiff Jackson was reasonable, and that the officers' presence in the Jackson residence was lawful. The Court concludes, therefore, that no fourth amendment cause of action exists against Defendant Young in this case. [*Jackson v. Young*, No. 77–1010, *supra* at 4–5 (footnote omitted).]

The court added that the Jacksons did not plead that the federal agents were involved in holding a gun on Michael but concluded, in any event, that "the alleged incident with the gun is not, in and of itself, an invasion of privacy and this Court can find no unwarranted invasion of privacy of any kind herein." *Id.* at 5.

■ In addition to the (uncontested) bar against reasserting a deprivation of the constitutional right of privacy, we conclude that the Jacksons are precluded from bringing a tort claim for invasion of privacy, for "[t]he right of privacy . . . [is] cog-

nate to the values and concerns protected by constitutional guarantees." *Afro-American Publishing Co. v. Jaffe*, 125 U.S.App. D.C. 70, 75, 366 F.2d 649, 654 (1966) (en banc) (footnote omitted). A tort claim for invasion of privacy may be successfully asserted only if the claimant has suffered an unreasonable and serious interference with protected interests. *Id.* The district court's findings that the arrest was reasonable and that the mistake was unintentional accordingly preclude this claim.

■ The district court's findings also defeat the plaintiffs' claims for procuring arrest and imprisonment,[13] false arrest, and false imprisonment. In this jurisdiction the gist of a complaint for false arrest or false imprisonment is an unlawful detention. *Marshall v. District of Columbia*, D.C.App., 391 A.2d 1374, 1380 (1978). A defense may be established if the officers had a good faith, reasonable belief in the validity of the arrest and detention. *Wade v. District of Columbia*, D.C.App., 310 A.2d 857, 862 (1973). The district court's finding that the arrest was reasonable and based on probable cause determines the issue of the validity of the arrest and detention by establishing a complete defense for the officers and the District.

■ The plaintiffs, similarly, are precluded from a claim of false pretenses because the district court found that the officers did not knowingly or intentionally make a false representation to the Jacksons, and there is no allegation in the complaint or affidavits of an intent to defraud. *See Fowler v. United States*, D.C.App., 374 A.2d 856 (1977) (crime of false pretenses requires intent to defraud); *Willgoos v. United States*, D.C.App., 228 A.2d 635 (1967) (same). *See generally*, D.C.Code 1973, § 22–1301.

■ The plaintiffs also claimed that the District and the individual police officers

13. We are unable to find any support for the plaintiffs' assertion of a tort called "procuring arrest and imprisonment." We assume they are alleging that a protected interest was violated by the instigation of an illegal arrest and imprisonment of Michael. The following discussion of false arrest and imprisonment, therefore, embraces the "procurement" assertion.

were negligent in the misidentification of Michael Jackson which led to his arrest. Negligence is conduct that falls below the legal standard established for protection of others against unreasonable risk or harm. Restatement (Second) of Torts § 282 (1965). Because the district court found the misidentification of Michael Jackson to be reasonable, the negligence claim is also necessarily precluded.

■ Finally, the district court's conclusions that the officers did not enter the Jacksons' home forcibly and that they were lawfully on the property negate the claim of breaking and entering. *Cf. Shehyn v. United States*, D.C.App., 256 A.2d 404 (1969) (individual may enter property of another for legitimate purposes at a reasonable time and in a reasonable manner).

### V.

■ We turn now to the remaining claims: infliction of emotional distress and assault and battery. The district court's opinion does not dispose of these because it dealt only with the arrest. Even though the arrest was lawful, a claim for assault and battery may be established if excessive force was used to maintain the arrest.[14] *See Wilson v. Gutschenritter*, 185 Neb. 311, 317, 175 N.W.2d 282, 286 (1970); *Wirsing v. Krzeminski*, 61 Wis.2d 513, 519, 213 N.W.2d 37, 40 (1973). And, presumably, emotional distress could result from a serious case of excessive force. Summary judgment, therefore, will be appropriate only if " 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.' " *Starks v. North East Insurance Co.*, D.C.App., 408 A.2d 980, 982 (1979) (quoting Super.Ct.Civ.R. 56(c)).

■ First, viewing the facts in a light most favorable to the plaintiffs, *see, e. g., International Underwriters, Inc. v. Boyle*, D.C.App., 365 A.2d 779, 782 (1976), we concluded that plaintiffs have not established a claim of battery. A battery is an intentional act that causes a harmful or offensive bodily contact. Restatement (Second) of Torts, *supra*, § 18. The Jacksons have not alleged in their complaint or affidavits that any offensive touching of Michael Jackson or any other member of the family occurred during the course of the arrest. Thus, judgment for defendants was proper here.

The alleged assault presents a more difficult question. The Jacksons contend that the officers drew guns on Michael while he was asleep in bed, awakened him, and thus put him in fear of imminent bodily harm. *See* Restatement (Second) of Torts, *supra*, § 21.[15] Mrs. Jackson stated in an affidavit supporting the Plaintiffs' Opposition to Defendants' Motion for Summary Judgment:

Michael was sleeping. One of the men stood at the head of the bed and the other stood to the side. Both men were pointing guns at Michael in my presence.

In his affidavit, Michael stated:

I woke up with a gun in my face. The gun in my face filled me with fright. Sometimes at night I have nightmares over the whole incident. I wake up because I see this gun in my face, and this

---

**14.** In fact, the district court judge noted that "[i]t may be that someone is liable for assaulting Michael Jackson and for damages accruing therefrom," but that issue was not properly pleaded against the defendants in that action.

**15.** Section 21 of the Restatement (Second) of Torts provides:

(1) An actor is subject to liability to another for assault if
  (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and
  (b) the other is thereby put in such imminent apprehension.

(2) An action which is not done with the intention stated in Subsection (1, a) does not make the actor liable to the other for an apprehension caused thereby although the act involves an unreasonable risk of causing it and, therefore, would be negligent or reckless if the risk threatened bodily harm.
*Compare* Standardized Jury Instructions for the District of Columbia, No. 260 (1968).

Because we conclude that a jury question is not presented here, we need not resolve the minor variations between Restatement § 21 and Jury Instruction No. 260.

gun pointed at me. When I saw the gun in my face and I looked again there was another gun pointed at me by an agent present. These things still scare me to death.

This alleged show of force by the police during the arrest is the crux of the assault claim.

In making an arrest, however, a police officer is privileged even to use force unless the "means employed are in excess of those which the actor reasonably believes to be necessary." Id. at § 132.[16] We conclude that a police officer is protected to an even greater degree against assault claims arising from arrests: unless the threatened use of force is clearly excessive, an officer is protected against liability for assault.[17] The question, therefore, is whether the Jacksons have alleged facts which would permit a reasonable jury to find a clearly excessive show of force, representing an "inten[tion] to cause . . . an imminent apprehension of [a harmful or offensive] contact," id. at § 21(a), with the result that Michael Jackson was "put in such imminent apprehension." Id. at § 21(b); see note 15 supra.

We conclude that the Jacksons have not done so. Even if we accept their version of the events for purposes of reviewing the propriety of summary judg-

ment,[18] we must evaluate the police actions on the premise (in the words of the district court) that there was "probable cause and . . . a good faith effort to arrest a Sting II suspect" chargeable, potentially, with a felony offense. The police, at most, are alleged to have made the arrest with guns drawn and held toward the suspect at close range. While they were not pursuing an armed felon shortly after the crime,[19] or making an arrest under other manifestly dangerous circumstances, such as an approach to a vehicle,[20] we are not willing to say that the police in a less forbidding situation, in making a felony arrest for which there is probable cause, must forbear from drawing and holding their guns in a manner calculated, as a matter of reasonable judgment, to protect their own safety. If the show of weapons under the circumstances here had been accompanied by threatening gestures or even by verbal threats, a jury question might have been presented. But on the facts alleged here, the officers' actions were not clearly excessive; as a matter of law, there was no assault.

Finally, we reach the Jacksons' claim of infliction of emotional distress. To establish that cause of action, they must show "extreme and outrageous conduct

---

16. We need not determine how far we would defer to an officer's judgment when force actually is used. In several jurisdictions, cases in which there is substantial evidence of unreasonable force, such as injury to the arrestee, have been presumed to pose jury questions. See Hamilton v. Chaffin, 506 F.2d 904, 912 (5th Cir. 1975); Luciano v. Ren, Mont., 589 P.2d 1005, 1008 (1979); Todd v. Creech, 23 N.C.App. 537, 539, 209 S.E.2d 293, 295 (1974).

17. We derive the "clearly excessive" standard for threatened use of force from Comment a in the Restatement (Second) of Torts § 132: "[I]f the actor is making or attempting to make an arrest for a criminal offense he is acting for the protection of the public interest and is permitted even a greater latitude of discretion than when he acts in self-defense, and he is not liable unless the means which he uses are clearly excessive." Factors relevant to this determination are "the known character of the [arrestee], the nature of the offense with which

he is charged or suspected, and the chance of his escape or rescue." Id., Comment c.

This description of the applicable standard, which is somewhat more deferential to the police than that stated in § 132 itself, is particularly appropriate for assault cases not involving a battery, since evidence of physical injury will not be available to aid the fact finder.

18. In his statement supporting the Defendants' Motion for Summary Judgment, Special Agent Young made no mention of pulling a gun during the arrest. Young was the only member of the arrest team who submitted a statement.

19. See United States v. Diggs, 173 U.S.App. D.C. 95, 99, 522 F.2d 1310, 1314 (1975), cert. denied sub nom. Floyd v. United States, 429 U.S. 852, 97 S.Ct. 144, 50 L.Ed.2d 127 (1976).

20. See United States v. Balsamo, 468 F.Supp. 1363, 1384 (D.Me.1979); Spero v. McKendrick, 266 F.Supp. 718, 724 (S.D.N.Y.1967), aff'd, 409 F.2d 181 (2d Cir. 1969).

[which] intentionally or recklessly causes severe emotional distress." Restatement (Second) of Torts, *supra* § 46; *see also Clark v. Associated Retail Credit Men*, 70 App.D.C. 183, 185–87, 105 F.2d 62, 64–66 (1939); *Mosby v. Bank of Virginia*, 106 Wash.D.L.Rptr. 1397, 1404 (D.C.Super.Ct. 1978). The conduct, in fact, must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." Restatement (Second) of Torts, *supra* at § 46, Comment d. Again, even if we fully accept the Jacksons' version of events, no "outrageous" police conduct was alleged. Specifically, there is no allegation that the gun was brandished in some way which would indicate an intentional or reckless disregard of the arrestee's emotional well being. The fact that an officer held a gun, even at close range, during an arrest on probable cause for a felony charge is not in itself so far out of bounds that it can give rise to an emotional distress claim.

## VI.

 The trial judge, accordingly, was correct in granting summary judgment on all counts of the complaint.[21]

*Affirmed.*

---

21. We also hold that the trial judge was correct in concluding that Walter Washington and Maurice Cullinane could not be held liable for any tort committed by the police officers because "the doctrine of respondeat superior has no application as between a public officer and his subordinates, unless the officer directs or countenances the tortious act." *Eskridge v. Jackson*, D.C.App., 401 A.2d 986, 989 (1979). Plaintiffs made no specific allegations implicating Washington or Cullinane.

We also need comment only briefly on the plaintiffs' additional contention that the officers violated D.C.Code 1973, § 16–2311 by not releasing Michael to his family or bringing him before the Director of Social Services after arrest, as that statute requires. The police here had not yet reached the point in their processing of Michael at which that determination had to be made. Michael was held only for several hours, and the officers did not fail to return him to his family "with all reasonable speed" as required by § 16–2311.