**Jose BEN–KOTEL, Plaintiff,**

v.

**HOWARD UNIVERSITY, Defendant.**

**Civil Action No. 00–1968(RMU).**

United States District Court, District of Columbia.

Aug. 15, 2001.

2001 WL 771012 (N.D.Tex. July 3, 2001), which is adverse to the Government's position. *See* Govt's Praecipe of July 19, 2001.

Kay Leslie Ackman, Silver Spring, MD, for Plaintiff.

Sheila Anne Lowery–Ferguson, Howard University, Office of the General Counsel, Washington, DC, for Defendant.

## MEMORANDUM OPINION

URBINA, District Judge.

### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

On August 15, 2000, Jose Ben–Kotel ("the plaintiff" or "Mr. Ben–Kotel"), a native of Chile, filed a three-count complaint against Howard University ("the defendant" or "Howard"). In Count I, the plaintiff alleges that Howard violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") by discriminating against him on the basis of his national origin by not

hiring him for a part-time teaching position. Count II sets forth allegations of similar violations of the District of Columbia Human Rights Act, D.C.Code § 1–2501 *et seq.* ("the DCHRA"). In Count III, the plaintiff claims he has suffered intentional infliction of emotional distress as a result of the alleged discrimination.

On May 18, 2001, Howard filed a motion for summary judgment on all three counts, arguing that Mr. Ben–Kotel has failed to make prima-facie cases of national-origin discrimination under Title VII and the DCHRA, and of intentional infliction of emotional distress.

## II. BACKGROUND

In August 1999, the Department of Modern Languages and Literatures ("the Department") at Howard needed to hire teachers to teach some Spanish classes left unassigned because of last-minute resignations of several faculty members. *See* Mot. for Summ. J. at 4. Dr. Alphonse Frost, the Interim Chairman of the Department at the time, asked Professor Amelia Mondragon, the Coordinator of the Spanish section, to find part-time teachers to teach the unassigned classes. *See id.* at 2–4; Frost Dep. at 48. Professor Mondragon, in turn, asked Professor Aleida Rodriguez to contact the Department of Spanish and Portuguese at the University of Maryland ("UMD") in search of part-time teachers. *See id.* at 5; Pl.'s Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n") at 2; Mondragon Dep. at 42. Professor Rodriguez called UMD and requested that notes be placed in Teaching Assistants' mailboxes announcing the vacant positions at Howard. *See* Mot. for Summ. J. at 5. These notes referred interested parties to Professor Rodriguez. *See id.*

A student at UMD's doctoral program in Spanish, Mr. Ben–Kotel called Professor Rodriguez in response to her inquiry. *See* Ben–Kotel Dep. at 48. During the telephone conversation, held entirely in Spanish, Professor Rodriguez told Mr. Ben–Kotel to call Professor Mondragon. *See id.* at 50. In his conversation with Professor Mondragon, also held entirely in Spanish, Professor Mondragon told Mr. Ben–Kotel to send in his resume and to call Dr. Frost. *See* Mot. for Summ. J. at 5–6; Ben–Kotel Dep. at 52, 54. Mr. Ben–Kotel called Dr. Frost, and during this conversation, held entirely in English, Dr. Frost stated that he needed to interview him. *See* Mot. for Summ. J. at 6; Ben–Kotel Dep. at 58–59.

Shortly thereafter, Mr. Ben–Kotel had his interview with Dr. Frost. *See* Mot. for Summ. J. at 6; Ben–Kotel Dep. at 59. During this meeting, also held entirely in English, Dr. Frost gave Mr. Ben–Kotel an application form and told him to submit three references. *See* Mot. for Summ. J. at 6; Frost Dep. at 49–50; Ben–Kotel Dep. at 70. Accompanied by his wife, Mr. Ben–Kotel personally delivered the completed application to Dr. Frost and discussed, among other things, the classes he would be teaching. *See* Mot. for Summ. J. at 7; Frost Dep. at 62; Ben–Kotel Dep. at 75. Dr. Frost wanted Mr. Ben–Kotel to teach Intensive Spanish One and Two. *See id.* Finally, Dr. Frost told Mr. Ben–Kotel to call Paul Logan, the Associate Dean for the Humanities in the College of Arts and Sciences at Howard. *See id.* at 2, 7; Logan Dep. at 10.

After this second meeting, Mr. Ben–Kotel called Professor Mondragon and told her that his interview with Dr. Frost went well and that Dean Logan would interview him next. *See* Mot. for Summ. J. at 8; Mondragon Dep. at 61. In response, Professor Mondragon indicated that the interview with Dean Logan would probably be a formality, discussed the textbook used in the Intensive Spanish class, and invited

Mr. Ben–Kotel to a faculty meeting. *See* Ben–Kotel Dep. at 84; Mondragon Dep. at 61.

Soon thereafter, Dean Logan interviewed Mr. Ben–Kotel over the telephone. *See* Mot. for Summ. J. at 8; Pl.'s Opp'n at 4; Logan Dep. at 60; Ben–Kotel Dep. at 90. This interview was held entirely in English. *See* Mot. for Summ. J. at 8; Ben–Kotel Dep. at 90. After the interview, Dean Logan expressed concerns about Mr. Ben–Kotel to Dr. Frost. *See* Mot. for Summ. J. at 11. Specifically, Dean Logan complained that he had difficulty understanding Mr. Ben–Kotel's responses to questions. *See id.;* Logan Dep. at 62–66; Frost Dep. at 76. Dr. Frost agreed. *See* Mot for Summ. J. at 11. Dean Logan was concerned that students would not understand Mr. Ben–Kotel when he would have to explain Spanish grammar in English and, therefore, told Dr. Frost that he should not go forward with Mr. Ben–Kotel's application. *See id.*

Dr. Frost called Mr. Ben–Kotel and explained that his application would not move forward because of concerns about his ability to explain Spanish grammar in English. *See id.* at 12; Frost Dep. at 76–77. According to Mr. Ben–Kotel, however, Dr. Frost told him that his application would not proceed because of his accent. *See* Pl.'s Opp'n at 5.

Howard states that at this time, it stopped seeking candidates for the part-time position, and that existing faculty juggled their schedules and taught the previously unassigned classes. *See* Mot. for Summ. J. at 12; Frost Dep. at 84–85.

Believing that he was discriminated against on the basis of his national origin, Mr. Ben–Kotel wrote to Howard seeking

reconsideration and clarification of why it had rejected his application. *See* Pl.'s Opp'n at 6. In response, Dr. Clarence Lee, the Dean of the College of Arts and Sciences at Howard, advised Mr. Ben–Kotel that his letter had been forwarded to Howard's General Counsel. *See id.*

Receiving no further response from Howard, Mr. Ben–Kotel filed a Complaint with the Equal Employment Opportunity Commission ("EEOC") and the D.C. Human Rights Commission. *See id.* at 6–7. The EEOC determined that there was reasonable cause for a discrimination claim under Title VII.[1] *See* EEOC Determination dated February 15, 2000. On June 8, 2000, the EEOC issued a letter giving Mr. Ben–Kotel the right to sue. *See* Compl. at 6; Pl.'s Opp'n at 7. Mr. Ben–Kotel filed this case on August 15, 2000.

### III. ANALYSIS

#### A. Legal Standard

Summary judgment is appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). To determine what facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *See Celotex,* 477 U.S. at 322, 106

---

1. The EEOC subsequently denied Howard's request for reconsideration. *See* EEOC Letter dated April 5, 2000. The court notes that the vast majority of discovery in this case had not yet taken place when the EEOC made its determination.

S.Ct. 2548; *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. All evidence and the inferences drawn must be considered in the light most favorable to the nonmoving party. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the ultimate burden of proof at trial." *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *See id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 674 (D.C.Cir.1999). Rather, the nonmoving party "must come forward with specific facts" that would enable a reasonable jury to find in its favor. *See id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Finally, the D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view summary-judgment motions in such cases with special caution. *See Aka*

*v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C.Cir.1997); *see also Johnson v. Digital Equip. Corp.*, 836 F.Supp. 14, 18 (D.D.C.1993).

## B. Discrimination Claims under Title VII and the DCHRA (Counts I and II)

■ Counts I and II allege employment discrimination under Title VII and the DCHRA, respectively. *See* Compl. at 6–8. Title VII prohibits an employer from refusing to hire any individual, or otherwise to discriminate against any individual, because of the individual's race, color, sex, or national origin. *See* 42 U.S.C. § 2000e–2(a)(1). The DCHRA proscribes the same conduct. *See* D.C.Code § 1–2512(a)(4)(B).[2]

### 1. The *McDonnell Douglas* Framework

To prevail on a claim of discrimination under Title VII, the Supreme Court has held that a plaintiff must follow a three-part burden-shifting analysis. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Court explained this scheme as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. . . . The ultimate bur-

---

**2.** Because the DCHRA is "substantially similar to Title VII," the court will treat the alleged violations under both acts together. *See Howard v. Best*, 484 A.2d 958, 977 (D.C.1984);

*see also Remedios Jose v. Hospital for Sick Children*, 130 F.Supp.2d 38, 41 (D.D.C.2000); *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 (D.C.1993).

den of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817 (citations omitted)).

Thus, the plaintiff must first establish a prima-facie case of discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C.Cir.1998) (*en banc* ). As a general matter, a prima-facie case of discrimination consists of the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff applied for and was qualified for the position at issue; (3) the plaintiff was rejected despite his qualifications; and (4) after the plaintiff's rejection, the position remained open and the employer continued to seek applicants. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir. 1981).

If the plaintiff succeeds in making a prima-facie case, the burden shifts to the employer to articulate a non-discriminatory reason for its action. The employer's burden, however, is merely one of production. *See Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089 (1981). The employer "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* If the employer is successful, the burden shifts back to the plaintiff to show that the defendant's proffered reasons are pretextual and that discrimination was the real reason for the action. *See McDonnell Douglas,* 411 U.S. at 802–805, 93 S.Ct. 1817; *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

In moving for summary judgment on the discrimination claims, the defendant makes two arguments. First, the defendant asserts that the plaintiff has failed to establish a prima-facie case of national origin discrimination under Title VII and the DCHRA. *See* Mot. for Summ. J. at 1. Second, the defendant maintains that the plaintiff has not met his burden of showing that the defendant's articulated legitimate, non-discriminatory reason for not hiring him was pretextual. *See id.* The court addresses each argument in turn.

### 2. The Plaintiff's Prima–Facie Case

The defendant argues that the plaintiff has failed to establish a prima-facie case of national origin discrimination because after the plaintiff was denied employment, the part-time position did not remain open and the defendant did not seek additional applicants. *See* Mot. for Summ. J. at 17–18. Instead, after denying the plaintiff employment, the defendant arranged for existing faculty members to teach the unassigned classes. *See id.;* Logan Dep. at 82, 86; Frost Dep. at 84–85.

The plaintiff counters by claiming that the defendant continued to seek applicants and hired an African–American, Ms. Kadidia Thiere. *See* Pl.'s Opp'n at 13. In so doing, the plaintiff relies on Dean Logan's and Dr. Frost's depositions. *See id.* When Dean Logan was asked about employment interviews he had conducted in the last five years, he mentioned Ms. Thiere. *See* Logan Dep. at 28–29. Dean Logan stated that he *thought* that his interview with Ms. Thiere took place in 1999. *See id.* at 29. Based on this statement, the plaintiff claims that Ms. Thiere was hired for the part-time position for which he had applied. *See* Pl.'s Opp'n at 13–14.

The defendant replies, however, that even though Dean Logan *thought* that Ms. Thiere was interviewed (and subsequently hired) in late 1999, Ms. Thiere was in fact hired on August 16, 1998. *See* Reply at 7–8. In support, the defendant provides the following:

(1) Dr. Frost's affidavit stating that "Ms. Thiero [sic] was hired effective August 16, 1998." Frost Aff. at 1–2.

(2) Ms. Thiere's "Personnel Recommendation Form," signed by Dr. Frost (with August 16, 1998 as the "effective date"); *see* Ex. 1 to Dr. Frost's Affidavit.

(3) Howard's Director of Employment, Mr. Marion McClain's affidavit, stating that "Howard University hired Kadidia Thiero [sic] effective August 16, 1998." McClain Aff. at 2.

(4) Howard's Director of Payroll, Mr. Philip Martin's affidavit, stating that payroll records indicate that "Ms. Theiro [sic] was hired effective August 16, 1998." Martin Aff. at 1–2.

(5) Payroll printout titled "Employee Information" (with "Hire Date" as August 16, 1998).

In light of this evidentiary support and the lack of any persuasive evidence to the contrary, the court agrees with the defendant that Dean Logan was simply mistaken when he said he *thought* that he interviewed Ms. Thiere in 1999. The court concludes that Ms. Thiere was hired on August 16, 1998, and, therefore, the defendant did not hire her for the part-time position that the plaintiff applied for in August 1999.

In addition to Dean Logan's deposition, the plaintiff also relies on Dr. Frost's statements to try to show that Ms. Thiere was hired for the part-time position. *See* Pl.'s Opp'n at 13 (citing Frost Dep. at 28–32, 43). In this portion of his deposition, however, Dr. Frost was not referring to Ms. Thiere, but rather to Ms. Maria Elvira Luna ("Ms.Luna"), another part-time teacher at Howard. *See* Frost Dep. at 28 ("Who was the coordinator at the time Ms. Luna was hired?"), at 29 ("Do you know why Ms. Luna came in?"), at 30 ("Did you contact the faculty, Dr. Frost, with regard to Ms. Luna?"). The plaintiff, apparently, is simply mistaken. In any event, Ms. Luna was also hired in 1998. *See* Reply at 6; Luna Dep. at 6–8. She too, then, was not hired for the part-time position that the plaintiff applied for in August 1999.

In sum, Ms. Thiere and Ms. Luna were both hired before August 1999. Accordingly, the plaintiff raises no genuine issue of material fact. The plaintiff has failed to demonstrate that the defendant continued to seek applicants for the part-time position. Because the plaintiff has failed to provide the requisite showing with respect to his prima-facie case, the court need not address the defendant's remaining arguments. Accordingly, the court grants the defendant's motion for summary judgment on Counts I and II.

## C. Intentional Infliction of Emotional Distress (Count III)

 A claim for intentional infliction of emotional distress requires the plaintiff "to show (1) extreme and outrageous conduct [by the defendant] which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Howard University v. Best,* 484 A.2d 958, 985 (D.C. 1984) (quotations and citations omitted). The "extreme and outrageous" requirement is not an easy one to meet. *See Drejza v. Vaccaro,* 650 A.2d 1308, 1312 (D.C.1994) (citations omitted). The defendant's conduct has to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Jackson v. District of Columbia,* 412 A.2d 948, 957 (D.C.1980) (citations omitted). Finally, in an employment context, the

proof required to support a claim for intentional infliction of emotional stress is particularly demanding. *See Kerrigan v. Britches of Georgetowne, Inc.,* 705 A.2d 624, 628 (D.C.1997).

The plaintiff argues that summary judgment is inappropriate for the emotional-distress claim because there are material disputed facts. *See* Pl.'s Opp'n. at 27. The defendant counters by asserting that the alleged conduct complained of by the plaintiff, "does not rise to the level required to establish a prima-facie case." *See* Mot. for Summ. J. at 30. The court agrees with the defendant.

The plaintiff essentially makes three arguments. First, according to the plaintiff, the defendant's alleged discrimination was not an isolated incident. *See* Pl.'s Opp'n at 28. Second, the defendant has failed to provide "statistical evidence that would be probative of [the] egregious conduct." *Id.* Finally, the plaintiff argues that he will be able to demonstrate that the defendant's egregious conduct "caused him significant emotional distress." *See id.* at 28–29.

■ First, the plaintiff argues that the defendant has a history of discriminating against Hispanics. *See id.* at 28. In support, the plaintiff states that "[t]o the extent that [he] can establish that" there is a "history of selecting-out Hispanic applicants and employees for discriminatory treatment, he would have gone a long way in making the required showing of outrageous or extreme conduct." *See id.* This argument, however, does not refer to any specific conduct in this case that would qualify as extreme and outrageous. For example, while "the sort of irrational accent-based discrimination that the [p]laintiff encountered," *see id.* at 29, could support a Title VII claim, it could not by itself support an intentional infliction of emotional distress claim. *See Kerrigan,* 705 A.2d at 628 (targeting an employee for sexual

harassment, manufacturing false evidence, leaking information to other employees, and unjustifiably demoting the employee does not rise to the required level of outrageous conduct); *King v. Kidd,* 640 A.2d 656, 670–74 (D.C.1993) (supervisor's repeated failure to respond to employee's sexual harassment claim does not rise to the required level of extreme and outrageous conduct); *Hoffman v. Hill & Knowlton Inc.,* 777 F.Supp. 1003, 1005 (D.D.C. 1991) (interference with employee's ability to work, stating false, pretextual reasons for dismissing employee knowing that it would be communicated to others, and ultimately dismissing employee does not rise to the required level of extreme and outrageous conduct).

■ Second, the plaintiff alleges that the defendant has refused to provide "statistical evidence that would be probative of [the] egregious conduct." This discovery-dispute argument, however, is not appropriate in an opposition to summary judgment. *See* Initial Scheduling And Procedures Order dated October 26, 2000 at 2–3(RMU) ("If. . .counsel are unable to resolve [discovery disputes], counsel shall contact chambers [to] arrange a telephone conference with the court."); *see also Chung Wing Ping v. Kennedy,* 294 F.2d 735, 737 (D.C.Cir.1961) (affirming summary judgment because the nonmoving party may not delay discovery "as a backdoor defense to a test of the merits of [the] claim"). The plaintiff's argument appears to be a last-ditch attempt to avoid summary judgment.

■ Finally, the plaintiff insists that he will be able to demonstrate that the defendant's conduct caused him significant emotional distress. *See* Pl.'s Opp'n at 28–29. This assertion, however, deals with the causation requirement and does not relate to whether the defendant's conduct was

extreme and outrageous. In other words, even if the plaintiff did establish that the defendant's conduct caused him emotional distress, he could not demonstrate, as a matter of law, that the defendant's conduct was extreme and outrageous. Because the court holds that the plaintiff has "fail[ed] to make a showing sufficient to establish the existence of" an essential element of his claim—whether the defendant's conduct was extreme and outrageous—the court grants the defendant's motion for summary judgment on the intentional infliction of emotional distress claim. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

## IV. CONCLUSION

For all these reasons, the court grants the defendant's motion for summary judgment on all three counts. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 15th day of August, 2001.

### *ORDER*

#### GRANTING THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued this 15th day of August, 2001, it is hereby

**ORDERED** that the defendant's motion for summary judgment is **GRANTED.**

**SO ORDERED.**