United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Filed November 12, 1998

 No. 98-7014

 Frances Rogala, 

 Appellant

 v.

 District of Columbia and Ephriam Williams, 

 Officer, Badge #4357, 

 Appellees

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 94-02516)

 ---------

 BEFORE: Silberman, Henderson, and Tatel, Circuit 
Judges.

 O R D E R

 Upon consideration of the motion for summary affirmance, 
the opposition thereto, and the reply, it is

 ORDERED that the motion be granted. The merits of the 
parties' positions are so clear as to warrant summary action. 

See Taxpayers Watchdog, Inc. v. Stanley, 819 F.2d 294, 297 
(D.C. Cir. 1987) (per curiam); Walker v. Washington, 627 
F.2d 541, 545 (D.C. Cir.) (per curiam), cert. denied, 449 U.S. 
994 (1980). We affirm the judgment for appellees on appel-
lant Rogala's claims substantially for the reasons well-stated 
in the district court's "Opinion, Findings of Fact and Conclu-
sions of Law" filed January 5, 1998, and reprinted as an 
appendix to this order. We note that although the district 
court discussed a "split" on whether police may detain a 
passenger during a traffic stop, this case is readily distin-
guishable from Dennis v. State, 693 A.2d 1150 (Md. 1997) 
(holding detention invalid). Unlike in Dennis, appellant did 
not seek to leave the scene, and Officer Williams merely 
required her to remain in the car, rather than in the street or 
on the sidewalk, in light of his concerns about his safety, her 
creation of a traffic hazard, and her interference with the field 
sobriety test. We do not reach appellant's arguments con-
cerning the field sobriety test administered to her companion 
Kinberg, as he did not appeal and appellant lacks standing to 
challenge the test. See, e.g., Rakas v. Illinois, 439 U.S. 128, 
133-34 (1978) (" 'Fourth Amendment rights are personal 
rights which, like some other constitutional rights, may not be 
vicariously asserted.' ") (quoting Alderman v. United States, 
394 U.S. 165, 174 (1969)).

 The Clerk is directed to withhold issuance of the mandate 
herein until seven days after disposition of any timely petition 
for rehearing. See D.C. Cir. Rule 41.

 Per Curiam

 APPENDIX

 Robert KINBERG and Frances ROGALA, 
 Plaintiffs,

 v.

 DISTRICT OF COLUMBIA, et al., 
 Defendants.

 Civil Action No. 94-2516 (PLF)

 United States District Court
 for the District of Columbia

 Jan. 5, 1998.

 OPINION, FINDINGS OF FACT AND 
 CONCLUSIONS OF LAW

 FRIEDMAN, J.

 Robert Kinberg and Frances Rogala bring this action for 
damages against the District of Columbia and Officer 
Ephriam Williams, an officer of the Metropolitan Police De-
partment ("MPD"). All of the claims arise from a traffic stop 
and ensuing arrest of both plaintiffs.

 Robert Kinberg was pulled over by Officer Williams as he 
drove through Georgetown late on a November evening with 
Frances Rogala as his passenger. After stopping the car, 
Officer Williams ordered Mr. Kinberg out of the car and 
directed him to undergo a field sobriety test. Ms. Rogala got 
out of the car to join Mr. Kinberg on the sidewalk. Plaintiffs 
claim that Officer Williams became aggressive and threaten-
ing and ordered Ms. Rogala back into the car. A dispute 
broke out between Ms. Rogala and Officer Williams, and 
Officer Williams ultimately arrested Ms. Rogala and Mr. 
Kinberg and charged them with assault. Both plaintiffs 
spent the night in custody and were released early the next 
morning. The United States Attorney's Office declined to file 
charges against either Mr. Kinberg or Ms. Rogala.

 Ms. Rogala and Mr. Kinberg sued Officer Williams and the 
District of Columbia for: (1) violating their Fourth Amend-

ment right to be free from unreasonable seizures; (2) violat-
ing Mr. Kinberg's Sixth Amendment right to counsel; (3) 
violating Mr. Kinberg's Fifth and Sixth Amendment rights to 
compulsory process and to due process of law; (4) committing 
assault and battery against both of them; (5) falsely arresting 
and imprisoning them; (6) maliciously prosecuting them; and 
(7) intentionally inflicting emotional distress on Ms. Rogala. 
Plaintiffs also claim that the District of Columbia negligently 
retained Officer Williams with the knowledge that he was 
unfit to serve as a police officer.

 The case was tried before the Court without a jury over a 
period of five days. At trial, Mr. Kinberg and Ms. Rogala 
testified on their own behalf. Plaintiffs also called as wit-
nesses Ms. Eva Kempner, Mr. Afzal Kahn, Dr. Eric Cantor, 
Dr. Lynn Hornyak, Mr. Brian Mooar, Mr. Gerald Fisher, an 
attorney representing Mr. Kinberg and Ms. Rogala in their 
efforts to seal their arrest records, Ms. Diane Walton, former 
Executive Director of the Civilian Complaint Review Board, 
Mr. Louis Wolff and Mr. Robert Klotz, a former Captain and 
former Commanding Officer of Internal Affairs for the MPD, 
who testified as an expert in police practices and procedures.

 Officer Williams testified in his own defense. Defendants 
also called as a witness Mr. Jerry Wilson, a twenty-five year 
veteran and former Chief of the MPD, who testified as an 
expert in police practices and procedures.

 I. FINDINGS OF FACT

 At approximately 11:00 p.m. on Monday, November 22, 
1993, plaintiff Robert Kinberg was driving westbound on M 
Street, Northwest, in Georgetown with plaintiff Frances Ro-
gala as his passenger. The two, both attorneys, were driving 
home after seeing a special showing of the movie Schindler's 
List. Officer Ephriam Williams, an officer with the Metro-
politan Police Department since 1986, was stationed alone in 
the 3200 block of M Street, Northwest, and observed Mr. 
Kinberg pull up next to a blue car and stop at a red light at 
the intersection of 33rd and M Streets. Officer Williams 
testified that he heard one of the cars stopped at the light 

race its engine. The blue car rocked forward slightly and 
then stopped. Officer Williams testified that he then saw Mr. 
Kinberg drive through the intersection against the red light. 
Mr. Kinberg and Ms. Rogala both testified that Mr. Kinberg 
did not run the red light.

 The Court finds Officer Williams' testimony credible. 
While Mr. Kinberg may not have intended to run the red 
light and may genuinely believe he did not, he may well have 
been drawn through the light by the movement of the car 
next to him.1 The Court credits the testimony of Officer 
Williams that he saw Mr. Kinberg run the red light and 
therefore concludes that the decision to stop Mr. Kinberg's 
car was reasonable.

 Officer Williams activated his emergency lights and 
stopped Mr. Kinberg's car in the 3400 block of M Street. 
Officer Williams testified that he pulled the car over in order 
to determine why the car had run the red light and to 
ascertain whether the driver was intoxicated. Officer 
Williams got out of his cruiser and walked up to the driver's 
side of the car. He testified that Mr. Kinberg's eyes ap-
peared "glossy" and that his face was "bloated." He request-
ed Mr. Kinberg's driver's license and vehicle registration and 
asked Mr. Kinberg whether he had been drinking. Both 
Officer Williams and Mr. Kinberg testified that Mr. Kinberg 
handed Officer Williams his license and registration and 
replied that he had not had anything to drink. At that point, 
Officer Williams ordered Mr. Kinberg to step out of the car 
for a field sobriety test.

 Officer Williams testified that he decided to conduct the 
field sobriety test based on the following facts: he had seen 
Mr. Kinberg run a red light; Mr. Kinberg's eyes were glossy 
and his face was bloated; and, in Officer Williams' experience, 
there were often intoxicated drivers traveling through 
Georgetown at that time of night. Former Chief Jerry 

__________
 1 Officer Williams also testified at trial that the light for east-
bound traffic turned green before the westbound light did, further 
supporting the idea that Mr. Kinberg mistakenly may have thought 
the light was green when he went through the intersection.

Wilson, defendants' expert in police practices, testified that 
these factors would be sufficient to indicate to a police officer 
that a driver may be intoxicated and to justify a field sobriety 
test.2 Mr. Kinberg disputes Officer Williams' characteriza-
tion of his facial appearance, and Ms. Eva Kempner, who saw 
Mr. Kinberg and Ms. Rogala at the movie earlier in the 
evening, testified that Mr. Kinberg looked normal after the 
movie. At trial, however, Mr. Kinberg testified that he may 
have cried at the movie, which he said had an emotional 
impact on both him and Ms. Rogala, and that his eyes may 
have been red.

 The Court finds credible Officer Williams' testimony both 
about his observation of Mr. Kinberg's appearance and his 
reasons for conducting the field sobriety test. While Mr. 
Kinberg's glossy eyes and bloated face may have been caused 
by his reaction to the movie that he had just seen, in Officer 
Williams' experience Mr. Kinberg's appearance was consis-
tent with that of an intoxicated person. Combined with the 
other factors identified by the officer, Mr. Kinberg's appear-
ance was a legitimate basis for Officer Williams' decision to 
conduct a field sobriety test.

 Officer Williams testified that he called for back-up at this 
time and then moved Mr. Kinberg to the sidewalk near the 
rear of the vehicle for the field sobriety test. He said that he 
wanted to be in a position to keep both Mr. Kinberg and Ms. 
Rogala in his view for his own safety. The first test, a 
"finger count" test, required Mr. Kinberg to count to five on 
the fingers of one hand and then count back down. Mr. 
Kinberg began counting with his first finger and then realized 
that he should have started with his thumb because he was 
going to run out of fingers. When he realized his mistake, 
Mr. Kinberg stopped and asked Officer Williams to clarify the 

__________
 2 Plaintiff's expert, Robert Klotz, testified that a police officer 
must look at a combination of factors to determine whether to 
conduct a field sobriety test. In his view, however, if a police 
officer does not detect slurred speech, lack of coordination or 
alcohol on the driver's breath, the officer should not detain the 
driver to conduct a field sobriety test.


instructions. After Officer Williams repeated the instruc-
tions, Mr. Kinberg successfully performed the test. Officer 
Williams then had Mr. Kinberg perform an "alphabet test," 
which consisted of Mr. Kinberg reciting the alphabet from H 
to Z with his head tilted backwards.

 While Mr. Kinberg was performing these tests, Ms. Rogala 
opened the passenger door and began to get out of the 
vehicle. Officer Williams ordered her to get back into the 
car. Officer Williams testified that it is his usual practice to 
instruct passengers to remain in the car during traffic stops 
for their safety, as well as for his own. He testified that he 
instructed Ms. Rogala to get back into the vehicle because 
she was interfering with the field sobriety test and because he 
perceived her attitude as belligerent. Both defendants' and 
plaintiffs' police experts testified that it is consistent with 
appropriate police procedure to control the movements of 
individuals during a traffic stop if the officer has a reasonable 
belief that a threat is posed, and former Chief Wilson testified 
that except in the case of a high risk stop it was good police 
practice to direct passengers to stay in the vehicle during a 
traffic stop. The Court finds that Officer Williams believed 
that Ms. Rogala was interfering with the field sobriety test 
and was posing a threat when he ordered her back into the 
car.

 After several requests, Ms. Rogala initially complied with 
Officer Williams' instructions, got back into the vehicle and 
closed the passenger door. She then slid across to the 
driver's seat and exited the vehicle into the roadway on the 
driver's side. Officer Williams ordered Ms. Rogala to move 
out of the roadway and to get back into the car, and he told 
her that if she did not move out of the roadway he would 
arrest her for failing to obey his order. Officer Williams 
testified that he told her three times to get out of the street 
and that Ms. Rogala finally raised her hands over her head 
and said, "OK, lock me up; I want you to lock me up," and 
that he then advised her that she was under arrest. Officer 
Williams testified that he did not take her into custody at that 
time because he was the only officer on the scene, and he 
wanted to wait for backup before taking her into custody. 


Former Chief Wilson testified that it is a permissible practice 
to wait for back-up before effecting an arrest. Ms. Rogala 
testified that Officer Williams threatened to arrest her at this 
time, but she denies telling Officer Williams to lock her up.

 After this verbal exchange between Officer Williams and 
Ms. Rogala, Ms. Rogala moved to the other side of the car, 
but she refused the officer's direction to get back into the car. 
She informed Officer Williams that she was an attorney and 
that she had a right to be with Mr. Kinberg and observe him 
perform the field sobriety tests. Mr. Kinberg testified that 
he told Officer Williams that Ms. Rogala was his attorney and 
he wanted her to observe the sobriety test. Officer Williams 
testified that he repeatedly instructed Ms. Rogala to get back 
into the car but that she refused.

 Ms. Rogala eventually got back into the car on the passen-
ger side. She testified that she did not remember how much 
time passed before she got into the car, but in her statement 
to the police, she indicated that Officer Williams had his 
attention focused on her for approximately ten minutes. De-
fendant's Exhibit 28, p. 7. Ms. Rogala sat on the passenger 
seat with the door open and her feet on the curb. Ms. Rogala 
testified that Officer Williams ordered her to get all the way 
into the car and threatened to arrest her if she did not. She 
testified that she then got a pen and paper from her purse to 
write down Officer Williams' name and badge number. Ac-
cording to Ms. Rogala, after she asked him for his name and 
badge number, Officer Williams threatened to call for back-
up. Ms. Rogala also testified that two pedestrians who had 
stopped to watch the events were ordered to leave the area 
by Officer Williams.

 The Court finds that while Officer Williams may have told 
Ms. Rogala that he was going to call for a back-up unit after 
she asked him for his identifying information, his call for 
back-up was reasonable. According to plaintiff's own police 
expert, Robert Klotz, one-officer stops can be dangerous, and 
it therefore often is appropriate to call for backup. The 
Court finds that Officer Williams' decision to do so was 
reasonable and was not made in retaliation for Ms. Rogala's 


request for identifying information. The Court also finds 
credible Officer Williams' testimony that he in fact called for 
back-up when he first stopped Mr. Kinberg's car.

 Officer Williams testified that after a back-up officer ar-
rived he again told Ms. Rogala that she was under arrest and 
attempted to take her into custody. He ordered her out of the 
car; when she twice refused to come out of the car, he 
reached in to pull her out. Officer Williams testified that Ms. 
Rogala resisted his efforts to take custody of her, that she 
lunged forward and made a clawing motion with her hands 
and scratched his hand and that she screamed for Mr. 
Kinberg to come to her aid. Former Chief Wilson testified 
that if a passenger refuses to get out of a vehicle when placed 
under arrest, an officer may use force to get her out of the 
vehicle. Ms. Rogala testified that Officer Williams did not 
inform her that she was under arrest, but that he did grab 
her and pulled her out of the car; in doing so, she testified 
that he bruised her arm and she struck and bruised her head 
on the interior of the car and suffered a black eye. She did 
not deny calling out to Mr. Kinberg. The Court credits 
Officer Williams' testimony that he told Ms. Rogala that she 
was under arrest and that she resisted his efforts to take her 
into custody. The Court finds that Ms. Rogala resisted 
Officer Williams' attempts to arrest her and that Officer 
Williams acted reasonably in the circumstances.

 Meanwhile, Mr. Kinberg, responding to Ms. Rogala's 
scream, approached Officer Williams from behind. Officer 
Williams testified that Mr. Kinberg grabbed him around the 
neck and shoulder; Mr. Kinberg testified that he merely 
touched Officer Williams on the shoulder. Officer Williams 
turned to face Mr. Kinberg, and the two tussled while Officer 
Williams attempted to handcuff Mr. Kinberg. Mr. Kinberg 
testified that Officer Williams threw him to the ground, while 
Officer Williams testified that they both fell to the ground 
while tussling; both agree that Mr. Kinberg ended up face-
down on the ground. Mr. Kinberg testified that he suffered 
neck and shoulder pain for three months as a result of being 
"tackled" by Officer Williams, but he acknowledged that 


Officer Williams did not hit, kick or punch him.3 Officer 
Williams testified that he arrested Mr. Kinberg for interfer-
ing while Officer Williams was trying to take Ms. Rogala into 
custody. Former Chief Wilson testified that a police officer 
is justified in arresting someone who physically interferes 
with an arrest by grabbing the police officer from behind.

 The Court finds that Officer Williams arrested Mr. Kinberg 
for interfering with the arrest of Ms. Rogala and that, while 
Mr. Kinberg may not have intended to threaten Officer 
Williams, it was not unreasonable for Officer Williams to 
believe that in responding to Ms. Rogala's screams Mr. 
Kinberg was in fact acting in a threatening manner toward 
Officer Williams and interfering with the arrest of Ms. Roga-
la. Given the fast-moving chain of events, Mr. Kinberg's 
concern for his friend, and the conflicting perceptions of the 
players in this drama as to exactly what was happening and 
why, the Court cannot find by a preponderance of the evi-
dence that Officer Williams' conduct with respect to Mr. 
Kinberg was assaultive or abusive rather than a reasonable 
police response to the situation.4

 Ms. Rogala and Mr. Kinberg were placed in Officer Rus-
nak's cruiser to await transport to the Second District police 
station. Ms. Rogala requested her purse from Mr. Kinberg's 
car, but Officer Williams refused to give it to her. Officer 
Williams testified that MPD procedures do not permit arres-
tees to have personal belongings, such as purses, in the 
transport vehicle. Ms. Rogala testified that she also asked 
Officer Williams if she could retrieve a silver bracelet that 
had fallen off her wrist. Officer Williams testified that he 
was not aware of any complaint by Ms. Rogala that she had 

__________
 3 Dr. Eric Cantor, a doctor of internal medicine, testified that Mr. 
Kinberg suffered mild rotator cuff syndrome and intermittent stiff-
ness of neck.

 4 Officer George Rusnak, who had arrived on the scene during the 
struggle, assisted in handcuffing Mr. Kinberg. Neither the plain-
tiffs nor defendants called Officer Rusnak, Officer Max Arevalo (the 
first back-up officer to arrive) or any other police officer as wit-
nesses to corroborate their version of the events.

lost her bracelet. When the transport vehicle arrived, Mr. 
Kinberg and Ms. Rogala were placed in it. Ms. Rogala 
testified that she overheard another officer ask Officer 
Williams if it was really necessary to arrest the two of them. 
Ms. Rogala testified that Officer Williams responded, "Why, 
cause they're fucking attorneys? Let them see what it is 
like." Mr. Kinberg testified that he never heard Officer 
Williams use profanity.

 Mr. Kinberg and Ms. Rogala then were taken to the 
Second District police station, where Officer Williams read 
them their Miranda rights and processed the paperwork in 
connection with their arrests. Both Mr. Kinberg and Ms. 
Rogala were charged with simple assault and were kept in 
separate holding cells pursuant to Second District procedures. 
Mr. Kinberg and Ms. Rogala testified that the cells were 
filthy. Ms. Rogala testified that she was frightened and was 
crying and that a number of officers (but not Officer 
Williams) were quite solicitous and tried to calm her down. 
Mr. Kinberg testified that he twice complained that his 
handcuffs were too tight. Officer Williams loosened the cuffs 
on both occasions. Officer Williams testified that Ms. Rogala 
kept interrupting him during his reading of Miranda rights, 
telling him that she knew her constitutional rights better than 
he did, and said that she would call the judge and get the 
charges dropped.

 Ms. Rogala testified that she was extremely upset and that 
she cried much of the time that she was at the station. Ms. 
Rogala also testified that Officer Williams was rude and 
taunted her. She testified that her hearing in one ear is 
impaired and that while she was speaking on the telephone 
with a pretrial services representative, she asked Officer 
Williams to change her handcuff so that she could hold the 
telephone to her good ear, but he refused. Both Dr. Cantor 
and Dr. Lynn Hornyak, a clinical psychologist, testified that 
Ms. Rogala suffered from Post Traumatic Stress Disorder as 
a result of the events surrounding the traffic stop and her 
arrest. As was apparent both from the substance of her 
testimony and her demeanor while testifying, Ms. Rogala was 
visibly upset by her experience, and the Court credits her 


testimony and her doctors' testimony that she was trauma-
tized by the events.

 Officer Williams testified that processing at the Second 
District took longer than an hour but less than the three hour 
time limit imposed by MPD regulations. Mr. Kinberg testi-
fied that they were at the Second District from approximately 
midnight until 3:30 a.m. Mr. Kinberg and Ms. Rogala were 
then transported to the Central Cell Block for fingerprinting 
and photographing. Mr. Kinberg testified that they were 
finally released at 5:30 a.m. and that they took a taxicab back 
to Mr. Kinberg's car.

 The United States Attorney decided not to file charges 
against Ms. Rogala and Mr. Kinberg, and they were so 
informed at their first court appearance on December 2, 1993. 
Gerald Fisher testified that Ms. Rogala and Mr. Kinberg 
went to considerable expense to seal their arrest records and 
that Ms. Rogala and Mr. Kinberg were still in the process of 
trying to get the records sealed. He stated that even if they 
succeeded in sealing the arrest records, the arrests will 
continue to affect their job prospects and lives.

 At trial, the Court heard testimony from three other peo-
ple, pursuant to Rule 404(b), Fed.R.Evid., about their experi-
ences with Officer Williams on other occasions. Mr. Afzal 
Kahn testified that in October 1991, he heard fire engines on 
his street and, when he went outside, he saw that his friend's 
house was on fire. As Mr. Kahn stood on the street with his 
neighbors watching the firefighters, Officer Williams ap-
proached him and told him to go away. Mr. Kahn testified 
that he refused to leave, and Officer Williams became abusive 
and asked Mr. Kahn if he understood English. When Mr. 
Kahn started to walk away, Officer Williams forcibly arrested 
him for failure to obey an officer. Mr. Kahn filed a complaint 
with the Civilian Complaint Review Board alleging harass-
ment and excessive force. Mr. Kahn's complaint for harass-
ment was sustained, but his excessive force complaint was 
not. The Board recommended that Officer Williams receive 
diversity training and that a letter of prejudice be placed in 


his file.5

 Officer Williams testified that he asked Mr. Kahn to move 
because the fire was dangerous and he was trying to keep the 
area clear. Officer Williams also testified that he was not 
sure that Mr. Kahn understood the order to move because 
Mr. Kahn had spoken with an accent. Mr. Louis Wolff, a 
journalist, testified that he witnessed the incident with Mr. 
Kahn and that Mr. Kahn was not impeding the firemen.

 Mr. Brian Mooar, a reporter with the Washington Post, 
testified that he witnessed Officer Williams and another 
officer arresting a woman for drunk driving and handcuffing 
her to a mailbox at approximately 2:30 a.m. on December 18, 
1993. The woman was crying and very distraught; the 
officer appeared to be laughing. Mr. Mooar testified that 
when he tried to photograph the incident, Officer Williams 
became abusive, grabbed Mr. Mooar's camera, and threat-
ened to arrest him. Mr. Mooar testified that he did not get 
his camera back until a sergeant arrived on the scene.6

 Having heard the testimony of the witnesses in this case 
and having observed their demeanor, the Court believes that 
Mr. Kinberg and particularly Ms. Rogala were upset, fright-
ened and shaken by their unaccustomed encounter with a 
police officer late at night in Georgetown. Because they 
probably believed they had not run a red light and knew they 
had not been drinking, they were undoubtedly also offended 
by the indignity of being stopped, ordered about, (in Mr. 
Kinberg's case) made to take a sobriety test, and ultimately 

__________
 5 A letter of prejudice is a written notice to a police officer 
"outlining specific unsatisfactory job performance or conduct." The 
letter of prejudice is considered in performance evaluations, may be 
used in deciding greater degrees of disciplinary action and places 
the police officer on notice that he or she "shall receive either an 
official reprimand or adverse action for any similar violation within 
a two year period." Plaintiffs' Exhibit 21, General Order No. 1202, 
et seq., Disciplinary Procedures and Processes at 8.

 6 The incident described by Mr. Mooar was the subject of litiga-
tion against the District of Columbia and Officer Williams. See 
DeGraff v. District of Columbia, 120 F.3d 298 (D.C. Cir. 1997).

arrested. No doubt that Officer Williams is an imposing, 
aggressive and controlling individual, as evidenced by his 
conduct here and in the case of Mr. Kahn. Furthermore, 
while the Court believes that other officers might have han-
dled the situation differently, the testimony of former Chief 
Wilson (and to a large extent of Mr. Klotz as well) persuades 
the Court that the procedures followed were not unreason-
able. The Court also finds that Ms. Rogala overreacted to 
Officer Williams' legitimate display of authority; she was 
aggressive and defiant of his authority and position. The 
situation escalated largely because of her conduct, not his, 
and the Court concludes that Officer Williams acted reason-
ably in the circumstances.

 II. CONCLUSIONS OF LAW

 Ms. Rogala and Mr. Kinberg have asserted claims under 42 
U.S.C. s 1983 against both Officer Williams and the District 
of Columbia for violations of their Fourth, Fifth and Sixth 
Amendment rights.7 They have asserted claims for false 
arrest, assault and battery, and malicious prosecution against 
both Officer Williams and the District of Columbia. Ms. 
Rogala has asserted a claim for intentional infliction of emo-
tional distress against both Officer Williams and the District 
of Columbia. Finally, Mr. Kinberg and Ms. Rogala have 
asserted a claim against the District of Columbia for negli-
gent retention of Officer Williams as a police officer. Each of 
these claims is considered separately below.

__________
 7 Section 1983 provides in pertinent part:

 Every person who, under color of any statute, ordinance, 
 regulation, custom, or usage of any State or Territory or the 
 District of Columbia, subjects, or causes to be subjected, any 
 citizen of the United States or other person within the jurisdic-
 tion thereof to the deprivation of any rights, privileges, or 
 immunities secured by the Constitution and laws, shall be liable 
 to the party injured in an action at law, suit in equity, or other 
 proper proceeding for redress.

42 U.S.C. s 1983.

 A. Section 1983 Claims Against Officer Williams

 1. Fourth Amendment

 A citizen who alleges that he or she has been subjected to 
an unreasonable search or seizure, or excessive force in the 
course of an arrest or seizure, in violation of the Fourth 
Amendment may seek redress under Section 1983. Graham 
v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 
(1989). In determining whether a seizure is reasonable, 
"[t]he touchstone of [the court's] analysis ... [is] the reason-
ableness in all the circumstances of the particular governmen-
tal invasion of a citizen's personal security." Pennsylvania v. 
Mimms, 434 U.S. 106, 108-109, 98 S.Ct. 330, 54 L.Ed.2d 331 
(1977). This analysis requires "a careful balancing of the 
nature and quality of the intrusion on the individual's Fourth 
Amendment interest against the countervailing governmental 
interests at stake." Graham v. Connor, 490 U.S. at 396 
(internal quotation omitted). The test is an objective one, 
made "from the perspective of a reasonable officer on the 
scene, rather than with the 20/20 vision of hindsight." Id. 
(citing Terry v. Ohio, 392 U.S. 1, 20-22, 88 S.Ct. 1868, 20 
L.Ed.2d 889 (1968)).

 Plaintiffs allege that Officer Williams' conduct, from the 
initial traffic stop through their arrests, violated their Fourth 
Amendment rights to be free of unreasonable seizures. 
Plaintiffs first allege that Officer Williams violated their 
Fourth Amendment rights by stopping Mr. Kinberg's vehicle 
without probable cause to believe that Mr. Kinberg had 
violated the law. Because the Court credits Officer Williams' 
testimony that he observed Mr. Kinberg run a red light, the 
initial stop of Mr. Kinberg's car was reasonable, supported by 
probable cause, and there therefore was no Fourth Amend-
ment violation. See Whren v. United States, 517 U.S. 806, 
116 S.Ct. 1769, 1777, 135 L.Ed.2d 89 (1996) (when officer has 
probable cause to believe a motorist has violated traffic laws, 
a traffic stop is presumptively reasonable).

 Plaintiffs next claim that Officer Williams lacked the requi-
site level of suspicion to conduct a field sobriety test. The 

Supreme Court has not directly addressed the level of suspi-
cion required for the detention of a lawfully stopped driver 
for a field sobriety test. See Michigan Dep't of State Police 
v. Sitz, 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 
(1990) (although police may set up roadblocks without any 
individual suspicion, detention of particular motorist for more 
extensive sobriety testing "may require satisfaction of an 
individualized suspicion standard") (in dictum). Because of 
the significant public interest in preventing a motorist whom 
an officer reasonably believes may be intoxicated from con-
tinuing to drive, and because further detention for a field 
sobriety test is a minimal intrusion on an already legally 
stopped individual's privacy, however, many state courts have 
held that an officer may detain a motorist for such testing so 
long as there is reasonable suspicion that the driver may be 
intoxicated. See, e.g., State v. Lamme, 19 Conn. App. 594, 
563 A.2d 1372 (Conn. App. 1989), affirmed, 216 Conn. 172, 579 
A.2d 484 (Conn. 1990) (administration of field sobriety tests 
requires only Terry reasonable suspicion); State v. Little, 468 
A.2d 615, 617-18 (Me. 1983) (same); State v. Superior Court, 
149 Ariz. 269, 718 P.2d 171, 175-76 (Ariz. 1986) (en banc) 
(same); State v. Wyatt, 67 Haw. 293, 687 P.2d 544, 552-53 
(Haw. 1984) (same); see generally 4 Wayne R. LaFave, 
Search and Seizure s 10.8(d) at 707-708 & n.176 (3d ed. 
1996); but see People v. Carlson, 677 P.2d 310 (Colo. 1984) 
(field sobriety test may be conducted only where officer has 
preexisting probable cause to arrest for driving under influ-
ence).

 No court in the District of Columbia has yet considered the 
degree of suspicion required to conduct a field sobriety test, 
but this Court is persuaded by the reasoning of the courts in 
those states that have concluded that a field sobriety test is 
such a minimal intrusion on the driver of the car that only 
reasonable suspicion is required to conduct such a test. At 
the time of the stop of Mr. Kinberg's car for running a red 
light, Officer Williams observed that Mr. Kinberg's eyes were 
glossy and that his face was bloated. These observations, 
when coupled with the fact that Officer Williams had just 
seen Mr. Kinberg drive through a red light, are sufficient to 


justify a field sobriety test under the reasonable suspicion 
standard.

 Plaintiffs also allege that Officer Williams unconstitutional-
ly seized Ms. Rogala when he ordered her to get back into 
the vehicle. A person has been "seized" under the Fourth 
Amendment if her freedom of movement is restrained by use 
of force or show of authority such that a reasonable person in 
the circumstances would believe that she is not free to walk 
away. United States v. Mendenhall, 446 U.S. 544, 553-54, 
100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The Court concludes 
that Officer Williams asserted such control over Ms. Rogala 
when he ordered her to get back into the car. The question 
is whether the exercise of that control violated Ms. Rogala's 
Fourth Amendment rights.

 The Supreme Court recently clarified that passengers in 
cars that are legitimately stopped may be subject to some 
control by the police officer conducting the stop. See Wilson 
v. Maryland, --- U.S. ----, 117 S.Ct. 882, 137 L.Ed.2d 41 
(1997). In Wilson, the Court held that a police officer 
conducting a valid traffic stop may constitutionally order a 
passenger out of the car, even where the police officer has no 
suspicion that the passenger has committed a crime. Id. at 
886. The court in Wilson expressly reserved the question of 
whether an officer may forcibly detain a passenger for the 
duration of the stop. See id. at 886, n.3. The courts are split 
on this issue. Compare United States v. Moorefield, 111 F.3d 
10 (3d Cir. 1997) (police officer lawfully ordered passenger to 
remain in car with hands in air) with Dennis v. State, 345 Md. 
649, 693 A.2d 1150 (Md. 1997) (where state articulated no 
reason why it was necessary for officer's safety to detain 
passenger rather than letting him walk away, detention un-
constitutional), cert. denied, --- U.S. ----, 118 S.Ct. 329, 139 
L.Ed.2d 255.

 In this case, Officer Williams ordered Ms. Rogala back into 
the car because she was blocking traffic and interfering with 
the field sobriety test that he was conducting of Mr. Kinberg. 
Both former Chief Wilson and Mr. Klotz testified that it is 
reasonable and appropriate police procedure to take steps to 


control the movements of individuals during a traffic stop if 
the officer reasonably believes that a threat is posed, and 
former Chief Wilson specifically testified that it is good police 
practice to direct passengers to stay in the vehicle during a 
traffic stop. This Court concludes that in the circumstances 
presented, it follows from Wilson v. Maryland that a police 
officer has the power to reasonably control the situation by 
requiring a passenger to remain in a vehicle during a traffic 
stop, particularly where, as here, the officer is alone and feels 
threatened. See United States v. Moorefield, 111 F.3d at 12-
13; United States v. White, 648 F.2d 29, 37 (D.C. Cir.) (in the 
context of traffic stops, "[c]ourts have routinely allowed offi-
cers to insist on reasonable changes of location when carrying 
out Terry stops. The exigencies of the circumstances deter-
mine what moves are reasonable in a given situation ...") 
(internal citations omitted), cert. denied, 454 U.S. 924, 102 
S.Ct. 424, 70 L.Ed.2d 233 (1981); see also United States v. 
Mangum, 100 F.3d 164, 169 (D.C. Cir. 1996). The Court 
concludes that it was reasonable for Officer Williams to order 
Ms. Rogala to stay in the car in order to maintain control of 
the situation and that he therefore did not violate her Fourth 
Amendment rights.

 Plaintiffs next assert that Officer Williams violated their 
Fourth Amendment rights because he lacked probable cause 
to arrest them. A police officer in the field can make a 
warrantless arrest if he has knowledge of "facts and circum-
stances sufficient to warrant a prudent [officer] in believing 
that the [suspect] had committed or was committing an 
offense." Gerstein v. Pugh, 420 U.S. 103, 111, 95 S.Ct. 854, 
43 L.Ed.2d 54 (1975); see also D.C. Code s 23-581(a)(1)(B) (a 
law enforcement officer may arrest without a warrant "a 
person who he has probable cause to believe has committed 
or is committing an offense in his presence").

 Officer Williams arrested Ms. Rogala for disobeying his 
order to return to the car after she had interfered with the 
field sobriety test that he was conducting. Ms. Rogala's 
interference and refusal to obey Officer Williams' orders 
provided grounds for her warrantless arrest. See D.C. Code 


s 22-505(a).8 While D.C. Code s 22-505(a) has been narrow-
ly construed to apply to physical conduct rather than speech, 
In the Matter of E.D.P., Jr., 573 A.2d 1307, 1309 (D.C. 1990), 
Officer Williams was responding to Ms. Rogala's physical 
conduct in refusing to return to the car, which prevented him 
from focusing his attention on conducting Mr. Kinberg's field 
sobriety test. Plaintiffs' police expert, Mr. Klotz, testified 
that citizens are required to obey lawful orders of the police, 
and on cross examination, he testified that if a passenger 
constitutes a threat or interferes with an officer's routine 
performance of his duties, the officer may arrest the passen-
ger. Defendant's expert, former Chief Wilson, testified that 
if a passenger seeks to interfere with a field sobriety test, the 
officer may order her to stop interfering; he also testified 
that passengers are ordinarily told to remain in the vehicle 
during traffic stops. As discussed above, the Court finds that 
Officer Williams had reasonable grounds to order Ms. Rogala 
to remain in the car to prevent her from interfering with the 
field sobriety test. Ms. Rogala disobeyed that order and 
remained outside the car for ten minutes. Her refusal to 
obey Officer Williams' order interfered with Officer Williams' 
performance of his official duties and constituted an arresta-
ble offense committed in his presence.

 Officer Williams arrested Mr. Kinberg for interfering with 
his arrest of Ms. Rogala. Impeding an officer performing an 
arrest is a criminal offense. See D.C. Code s 22-505(a). Mr. 
Kinberg's intent may have been only to calm the situation. 
From Officer Williams' perspective, however, Mr. Kinberg's 

__________
 8 D.C. Code s 22-505(a) provides, in pertinent part,

 (a) Whoever without justifiable and excusable cause, as-
 saults, resists, opposes, impedes, intimidates or interferes with 
 any officer or member of any police force operating in the 
 District of Columbia ... while engaged in or on account of the 
 performance of his or her official duties, shall be fined not more 
 than $5,000 or imprisoned not more than 5 years, or both. It is 
 neither justifiable nor excusable cause for a person to use force 
 to resist an arrest when such arrest is made by an individual he 
 or she has reason to believe is a law enforcement officer, 
 whether or not such arrest is lawful.

actions constituted a threat to Officer Williams as Officer 
Williams tried to arrest Ms. Rogala. A reasonably prudent 
officer in Officer Williams' situation could well believe that 
Mr. Kinberg was intending to interfere with the arrest of Ms. 
Rogala. Officer Williams therefore had probable cause to 
arrest Mr. Kinberg.

 Finally, plaintiffs claim that Officer Williams' actions in 
pulling Ms. Rogala from the car, his alleged verbal harass-
ment and his tackling of Mr. Kinberg constitute violations of 
their Fourth Amendment rights. Under the "objective rea-
sonableness" standard of the Fourth Amendment, an officer 
has the authority to use "some degree of physical coercion or 
threat thereof" during the course of an arrest, and "not every 
push or shove, even if it may later seem unnecessary in the 
peace of a judge's chambers," violates the Fourth Amend-
ment. Graham v. Connor, 490 U.S. at 395-97. The use of 
such coercion is to be judged "from the perspective of a 
reasonable officer on the scene ... [with] allowance for the 
fact that police officers are often forced to make split-second 
judgments ... about the amount of force that is necessary in 
a particular situation." Id. at 396-97. An officer will only be 
held liable if the force used was so excessive that no reason-
able officer could have believed in the lawfulness of his 
actions. See Wardlaw v. Pickett, 1 F.3d 1297, 1303 (D.C. Cir. 
1993), cert. denied, 512 U.S. 1204, 114 S.Ct. 2672, 129 L.Ed.2d 
808 (1994). The underlying intent or motivation of the officer 
is not considered; the only issue is whether the officer's 
actions are " 'objectively reasonable' in light of the facts and 
circumstances" confronting him. See DeGraff v. District of 
Columbia, 120 F.3d 298, 301 (D.C. Cir. 1997). In view of the 
factual and credibility findings made by the Court, the Court 
necessarily concludes that the force used by Officer Williams 
was not excessive and that his conduct was objectively rea-
sonable.

 In taking custody of Ms. Rogala, Officer Williams reached 
into the car and pulled her out by the arm. Defendants' 
police expert testified that it is permissible police procedure 
to reach into a vehicle to remove a person who has been 
placed under arrest and who refuses to get out of the vehicle. 


The Court finds that Ms. Rogala did not exit the vehicle when 
Officer Williams tried to take her into custody and ordered 
her out of the car. The Court also finds that Ms. Rogala 
resisted Officer Williams' attempts to remove her from the 
car. There is no indication that Officer Williams used exces-
sive force in removing Ms. Rogala from the car. See Martin 
v. Malhoyt, 830 F.2d 237 (D.C. Cir. 1987) (no excessive force 
even where arresting officer allegedly brutally grabbed driver 
by waist, threw him back into the driver's seat and slammed 
door on his legs). The Court finds that the level of force used 
by Officer Williams to remove Ms. Rogala from the car was 
reasonable, and that there was no constitutional violation.

 Officer Williams' arrest of Mr. Kinberg resulted in Mr. 
Kinberg being thrown to the ground, according to Mr. Kin-
berg, or placed on the ground or having fallen there as the 
result of a tussle, according to Officer Williams. Defendants' 
police expert testified that if an officer is grabbed from 
behind, the officer may have to tackle the person if it is 
necessary to bring the person under control. Officer 
Williams reasonably perceived Mr. Kinberg's actions as 
threatening and interfering with his arrest of Ms. Rogala. 
The Court finds that Officer Williams did not use unreason-
able force in responding to that threat. See Wardlaw v. 
Pickett, 1 F.3d at 1304 (no unreasonable force where U.S. 
Marshal punched man in jaw and chest who interfered with 
arrest).

 The Court finds that plaintiffs have failed to establish a 
deprivation of their Fourth Amendment rights, and Officer 
Williams is entitled to judgment on this claim.

 2. Sixth Amendment

 Mr. Kinberg next asserts that Officer Williams' attempted 
control over Ms. Rogala during the field sobriety test de-
prived him of his right to counsel in violation of the Sixth 
Amendment. There is no merit to this claim.

 The Sixth Amendment right to counsel attaches only upon 
the initiation of adversarial judicial criminal proceedings, 
which include the "formal charge, preliminary hearing, indict-

ment, information, or arraignment," Kirby v. Illinois, 406 
U.S. 682, 688-89, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), and 
"certain 'critical' pretrial proceedings ... [at which] the ac-
cused [is] confronted, just as at trial, by the procedural 
system, or by his expert adversary, or by both." United 
States v. Gouveia, 467 U.S. 180, 189, 104 S.Ct. 2292, 81 
L.Ed.2d 146 (1984) (citation omitted). Mere confrontation 
with a police officer, or even an arrest, does not signal the 
initiation of such proceedings. Id.; see Schmerber v. Califor-
nia, 384 U.S. 757, 765-66, 86 S.Ct. 1826, 16 L.Ed.2d 908 
(1966) (no Sixth Amendment right to counsel in connection 
with blood alcohol test). Until adversary judicial proceedings 
have been initiated, the mere "fortuity" that a person happens 
to have retained counsel does not give that person a Sixth 
Amendment right to consult with that counsel. See Moran v. 
Burbine, 475 U.S. 412, 430, 106 S.Ct. 1135, 89 L.Ed.2d 410 
(1986) ("the suggestion that the existence of an attorney-
client relationship itself triggers the protections of the Sixth 
Amendment misconceives the underlying purposes of the 
right to counsel ... [the right to counsel] becomes applicable 
only when the government's role shifts from investigation to 
accusation").

 When Officer Williams ordered Ms. Rogala to return to the 
car, he was conducting a field sobriety test of Mr. Kinberg. 
No formal charges had been filed against Mr. Kinberg at that 
time, and adversary judicial proceedings had not been initi-
ated. Without the initiation of criminal judicial proceedings, 
Mr. Kinberg's Sixth Amendment right to counsel had not yet 
attached. Kirby v. Illinois, 406 U.S. at 688-89. The "fortui-
ty" that he was stopped while riding with an attorney does 
not give him any additional Sixth Amendment protection. 
See Moran v. Burbine, 475 U.S. at 428-31. Officer Williams 
therefore is entitled to judgment on this claim.

 3. Fifth and Sixth Amendments

 Plaintiffs' final constitutional claim against Officer Williams 
is that he violated Mr. Kinberg's Sixth Amendment right to 
compulsory process and his Fifth Amendment right to due 


process of law by excluding Ms. Rogala from witnessing the 
sobriety test and by ordering two bystanders to leave the 
area. Plaintiffs have not established a deprivation of a consti-
tutional right, and judgment on this claim therefore is en-
tered for Officer Williams.

 Plaintiffs cite no case establishing an affirmative duty on 
the part of the police to allow bystanders to remain at an 
arrest scene so that they may become witnesses favorable to 
the arrestee. The duty of the police to preserve material and 
potentially exculpatory evidence does not extend to require an 
officer to allow witnesses to remain at potentially dangerous 
scenes of crime. See Arizona v. Youngblood, 488 U.S. 51, 58, 
109 S.Ct. 333, 102 L.Ed.2d 281 (1988); United States v. 
McKie, 951 F.2d 399, 403 (D.C. Cir. 1991). Such a duty 
would be inconsistent with the officer's prerogative to control 
the scene of an encounter for his own safety and for the 
safety of the public. See United States v. White, 648 F.2d at 
37.

 Even if plaintiffs could establish that Officer Williams had a 
duty to preserve witnesses, there is no basis for a constitu-
tional claim unless a defense is prejudiced by the breach of 
that duty. See California v. Trombetta, 467 U.S. 479, 488, 
104 S.Ct. 2528, 81 L.Ed.2d 413 (1983); United States v. 
Alston, 832 F. Supp. 1, 5-6 (D.D.C. 1993). The fact that 
neither Mr. Kinberg nor Ms. Rogala was ever prosecuted on 
any charges stemming from their altercation with Officer 
Williams ends the analysis. In the absence of a criminal trial, 
there was no defense to be prejudiced by the unavailability of 
bystanders to testify or by the absence of Ms. Rogala's 
testimony. Cf. United States v. Alston, 832 F. Supp. at 5-6. 
Plaintiffs therefore have failed to establish a deprivation of 
their Fifth or Sixth Amendment rights.

 B. Section 1983 Claims Against The District of Columbia

 Plaintiffs allege that the District of Columbia has been 
deliberately indifferent to the rights of its citizens by failing 
to maintain effective systems for evaluation of the perfor-
mance of its police officers, for in-service training of its 

officers, and for resolution of citizen complaints. Pls.' Pre-
trial Brief at 17-18. They further allege that this failure to 
act caused the violation of their constitutional rights through 
the conduct of Officer Williams. Id.

 A municipality may be sued under Section 1983 for imple-
menting or executing a policy or custom that causes the 
deprivation of an individual's constitutional rights. Monell v. 
Dep't of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 
56 L.Ed.2d 611 (1978). Plaintiffs therefore have the burden 
of proving (1) that they were deprived of constitutional 
right(s); and (2) that the deprivation was caused by a policy 
or custom of the municipality. See Atchison v. District of 
Columbia, 73 F.3d 418, 420 (D.C. Cir. 1996) (municipality can 
only be held liable if it is "itself responsible for an unconstitu-
tional deprivation of rights"). For suits alleging failure to 
train or supervise, plaintiffs must also establish that the need 
for more or different training or supervision was so obvious 
and the inadequacy so likely to result in a violation of 
constitutional rights that policymakers can be said to have 
been deliberately indifferent to the need. See City of Canton 
v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 
(1989); Dorman v. District of Columbia, 888 F.2d 159, 165 
(D.C. Cir. 1989).

 Plaintiffs have not established the deprivation of any consti-
tutional right, see supra at Section A, and the Section 1983 
claim against the District of Columbia therefore cannot be 
sustained.

 C. Common Law Claims Against Officer Williams 

 And The District of Columbia

 Plaintiffs assert a number of common law claims against 
Officer Williams and the District of Columbia. The District 
of Columbia stipulates that Officer Williams acted within the 
scope of his employment throughout the encounter with plain-
tiffs. Therefore, any judgment in favor of or against Officer 
Williams on the common law claims will also constitute a 
judgment in favor of or against the District of Columbia 


under the doctrine of respondeat superior. See Wade v. 
District of Columbia, 310 A.2d 857, 863 (D.C. 1973).9

 1. False Arrest

 The central question in an action against a police officer for 
false arrest is whether the officer was justified in arresting 
the plaintiff. District of Columbia v. Murphy, 631 A.2d 34, 
36 (D.C. 1993); accord Dellums v. Powell, 566 F.2d 167, 175 
(D.C. Cir. 1977), cert. denied, 438 U.S. 916, 98 S.Ct. 3146, 57 
L.Ed.2d 1161 (1978). An officer can demonstrate justification 
by showing that he had probable cause to believe a crime had 
been committed. District of Columbia v. Murphy, 631 A.2d 
at 36; accord Wade v. District of Columbia, 310 A.2d at 862. 
The Court already has concluded that Officer Williams had 
probable cause to arrest both Ms. Rogala and Mr. Kinberg. 
Defendants therefore are entitled to judgment on this claim.

 2. Assault and Battery

 Plaintiffs next allege that Officer Williams assaulted and 
battered them by forcefully arresting them and by treating 

__________
 9 Plaintiffs also assert a common law negligent retention claim 
against the District of Columbia. In order to prevail on a negligent 
retention claim, plaintiffs must first prove that Officer Williams was 
negligent and must then prove the additional element of negligent 
retention. See e.g. Ang v. District of Columbia, Civil Action No. 
95-0667, Memorandum Opinion and Order at 5 (D.D.C. November 
25, 1995) (Friedman, J.); Middough v. District of Columbia, Civil 
Action No. 93-0622, Order at 4 (D.C. Super. July 27, 1993) (Kramer, 
J.). Because the District of Columbia has already stipulated that 
Officer Williams was acting within the scope of his employment, 
however, it is liable under a theory of respondeat superior for any 
tortious actions taken by Officer Williams and it is unnecessary for 
plaintiffs to prove the additional negligent retention element. See 
Curry v. Giant Food Co., 522 A.2d 1283, 1289-90 (D.C. 1987) 
(negligent retention claim intended to be used in situations where 
employer disclaims the actions of its employees). The Court there-
fore does not need to decide whether or not the District negligently 
retained Officer Williams. Cf. Burkhart v. Washington Metropoli-
tan Area Transit Authority, 112 F.3d 1207, 1215 (D.C. Cir. 1997).

them roughly and subjecting them to verbal abuse during 
their detention. In the course of making a lawful arrest, a 
police officer is privileged to use force so long as the "means 
employed are not in excess of those which [he] reasonably 
believes [are] necessary." Etheredge v. District of Columbia, 
635 A.2d 908, 916 (D.C. 1993) (internal quotation omitted). 
The officer's judgment is to be reviewed "from the perspec-
tive of a reasonable officer on the scene," with allowance for 
the officer's need to make quick decisions under potentially 
dangerous circumstances. Id. (quoting Graham v. Connor, 
490 U.S. at 396-97). This standard is similar to the excessive 
force standard applied in the Section 1983 context. Id. at 915 
n.10. Furthermore, an officer may commit what at common 
law would be an assault unless "the threatened use of force is 
clearly excessive." Jackson v. District of Columbia, 412 A.2d 
948, 956 (D.C. 1980). The Court finds that Officer Williams 
did not threaten Ms. Rogala or Mr. Kinberg with "clearly 
excessive" force. For substantially the reasons discussed 
supra at 18-19, the Court finds that Officer Williams did not 
use excessive force in arresting Ms. Rogala and Mr. Kinberg. 
Plaintiffs therefore have failed to prove their assault or 
battery claim.

 3. Malicious Prosecution

 An action for malicious criminal prosecution requires proof 
of the institution of a criminal action, with malice and without 
probable cause, that ultimately terminates in the plaintiffs' 
favor. Dellums v. Powell, 566 F.2d at 191 n.65. A criminal 
action is "instituted" upon the filing of an information or 
indictment; a mere arrest, not followed by the filing of an 
information or the return of an indictment, cannot give rise to 
liability for malicious prosecution. Id. at 192 (in dictum) 
(citing Auerbach v. Freeman, 43 App.D.C. 176 (D.C. Cir. 
1915) (when larceny charge was nolle prossed, no prosecution 
had been instituted)); see also Jackson v. District of Colum-
bia, 710 F. Supp. 13, 14-15 (D.D.C. 1989) (tort of malicious 
prosecution intended to remedy the "evil" of "defending 
against unjustified litigation," and the remedy therefore is 
unavailable for "mere arrest"). While Mr. Kinberg and Ms. 


Rogala were arrested for simple assault, no charges were 
ever filed against them. Because plaintiffs have failed to 
establish that there was any prosecution, much less a mali-
cious one, the Court enters judgment for defendants on this 
claim.

 4. Intentional Infliction of Emotional Distress

 Ms. Rogala asserts a claim for intentional infliction of 
emotional distress based upon Officer Williams' treatment of 
her prior to, during and after her arrest. Specifically, Ms. 
Rogala claims that Officer Williams threatened to arrest her 
repeatedly, yelled and cursed at her, ignored her request to 
recover her purse and bracelet after she was arrested, told 
her that he wanted her to see what it was like to be arrested, 
laughed at her hearing impairment, laughed when she cried, 
and detained her for an unnecessarily long time at the 
station. She claims that Officer Williams' conduct caused her 
severe emotional distress.

 To recover on a claim for intentional infliction of emotional 
distress, a plaintiff must demonstrate "extreme and outra-
geous conduct which intentionally or recklessly cause[d] se-
vere emotional distress." Jackson v. District of Columbia, 
412 A.2d at 956-57 (quoting Restatement (Second) of Torts 
s 46 (1965) ("Restatement")). The conduct must be "so 
outrageous in character, and so extreme in degree, as to go 
beyond all possible bounds of decency." Id. at 957 (quoting 
Restatement s 46 cmt. d). An action for intentional infliction 
of emotional distress may be maintained against an arresting 
officer if he made a lawful arrest but applied "a serious 
[quantum] of excessive force," id. at 955, or if he made an 
egregiously unlawful arrest. See Carter v. District of Colum-
bia, 795 F.2d 116, 139 (D.C. Cir. 1986). The ultimate ques-
tion is whether the officer's actions constituted "mere insults, 
indignities, threats, annoyances, petty oppressions, or other 
trivialities," or whether they were truly outrageous. See 
Restatement s 46 cmt. d.

 While the Court credits Ms. Rogala's testimony and that of 
her doctors that she was extremely distressed by Officer 
Williams' actions in arresting her, the Court finds that Officer 

Williams' conduct did not approach the level of egregiousness 
necessary to sustain a claim for intentional infliction of emo-
tional distress. The Court finds that Officer Williams told 
Ms. Rogala that he was going to arrest her, and he may have 
spoken to her with a raised voice and harsh words, but he did 
not yell and curse at her. The Court also finds that Officer 
Williams' refusal to allow Ms. Rogala to keep her purse with 
her is consistent with police procedure and was reasonable. 
The Court credits Officer Williams' testimony that he was not 
aware that Ms. Rogala had lost her bracelet. The Court also 
credits Officer Williams' testimony that Mr. Kinberg and Ms. 
Rogala were detained for less than three hours. Even ac-
cording to Mr. Kinberg's account, Mr. Kinberg and Ms. 
Rogala were held at the police station for at most something 
less than four hours, from a little before midnight until 3:30 
a.m. The Court finds that the duration of this detention does 
not constitute outrageous conduct. Finally, to the extent that 
Ms. Rogala perceived that Officer Williams took pleasure in 
arresting her, the alleged conduct simply does not rise to the 
level of truly outrageous conduct "as to go beyond all possible 
bounds of decency." Jackson v. District of Columbia, 412 
A.2d at 957. Plaintiff therefore has failed to establish this 
claim.

 III. CONCLUSION

 The events that occurred on the evening of November 22, 
1993 were most unfortunate. They had a considerable impact 
on the lives of Mr. Kinberg and especially Ms. Rogala. On an 
objective reasonableness standard, however, and in view of 
the credibility findings made by the Court, the Court cannot 
find that plaintiffs have carried their burden of proof by a 
preponderance of the evidence on any of their claims. The 
Court finds that Officer Williams' conduct violated none of the 
constitutional or common law rights asserted by plaintiffs and 
that his conduct was objectively reasonable. Judgment 
therefore must be entered for defendants on all claims.

 An Order and Judgment consistent with this Opinion shall 
be issued this same day.

 SO ORDERED.